In the Matter of the Death of Toney Wayne SIDWELL; Carole R. Sidwell, Petitioner,

v.

EASTERN DRILLING, New Hampshire Insurance Company and Workers' Compensation Court, Respondents.

No. 55640.

Court of Appeals of Oklahoma, Division No. 2.

Nov. 10, 1981.

Released for Publication by Order of Court of Appeals Dec. 11, 1981.

William A. Vassar III, Oklahoma City, for petitioner.

Yvonne Sprager Nichols, Looney, Nichols, Johnson & Hayes, Oklahoma City, for respondents.

BRIGHTMIRE, Judge.

The death of an oil man—was it caused solely by alcoholic intoxication? The trial court found it was and that the employer overcame, with substantial evidence, the statutory presumption that the accidental work-related death of its inebriated president was not due solely to intoxication, and denied workers' compensation death benefits to the official's widow. She appeals, assailing the finding and order as being wrong.

I

The chief executive officer of Eastern Drilling Company, Toney Sidwell, arrived

at the Wedgewood Club in Oklahoma City around 1930 hours on the evening of September 16, 1975. He was to meet with a pipe broker by the name of Jay Magness and discuss the potential purchase of some oil well-casing pipe. Shortly after he walked into the crowded and smoke-filled barroom, he ordered a drink and a sandwich. He looked for the contact and soon spotted him leaning on the bar drinking scotch.

Sidwell walked up to Magness, exchanged greetings and asked him if he really had pipe, because, said Magness, "lots of people didn't have." The broker said, "Yes, we had some four and a half, and we had some five and a half, but that it might be too heavy for them because he indicated they were shallow wells . . . ."

Magness, who had consumed "a half dozen drinks," said Sidwell did not appear to him to be intoxicated, but he thought it would have been strange if Sidwell had not been drinking because "during that period, we all had quite a bit to drink most of the time . . . ."

The two men talked for just a few minutes when Sidwell suddenly said, "Excuse me," turned and headed toward a stairwell at the foot of which was a restroom. On his way he met the club manager, Doris Chaney, who was bringing him his order. "Toney, don't you want your sandwich?" she asked. He "just kind of mumbled something and walked out. . . ." He appeared, she added, to be "very intoxicated . . . I couldn't understand what he said and he wasn't walking very good . . . [he was] unsteady on his feet."

Shortly after this, Sidwell was found lying near the bottom of the stairway, unconscious. An ambulance arrived on the scene at 2005 hours, instituted CPR (Cardiopulmonary resuscitation) and removed him to the nearby Baptist Medical Center. He was admitted there at 2020 hours, and an examination disclosed that the 39-year-old victim was cyanotic (blue) with fixed and dilated pupils. No vital signs were obtainable. The patient was intubated, given various CPR drugs, and after about 30 minutes of intensive therapy, began to respond. The examining physician considered subject's condition terminal. He noted a bruise over Sidwell's left eyebrow. There were no reflexes, no response to pain stimuli, no motor or sensory nerve functions, and a spinal tap brought forth bloody spinal fluid suggesting subarachoid or intrabrain hermorrhage. The examining physician wrote on the chart that "the patient evidently had been drinking and had a sudden catastrophic event producing his fall." A blood analysis at 2243 hours revealed an alcohol content of 0.19 percent.

The victim's wife, upon being informed of her husband's grave condition, advised the physician she wanted to donate his kidneys and corneas. He was kept alive until these organs could be removed. He expired at 1720 hours on September 18.

An autopsy was performed. The protocol discloses nothing of an organic or pathologic nature incompatible with the conclusion that a sudden alcohol induced cerebro-physiological event caused a loss of consciousness as the oil man proceeded down the stairs.

The widow filed this claim seeking death benefits under the Workers' Compensation Act. One defense raised by the employer was that the employee was intoxicated at the time of the accident. After hearing the evidence the trial court found that indeed "the sole and proximate cause of decedent's death was intoxication" and denied the claim.

II

The Workers' Compensation Act creates several presumptions to aid the claimant which are to prevail "in the absence of substantial evidence to the contrary." One such presumption is "that the injury did not result solely from the intoxication of the

injured employee while on duty." [1] So the question then, and the only one raised by the claimant, is whether substantial evidence was adduced that Sidwell's death resulted solely from a state of intoxication. Or as put by the claimant: "Did the employer prove by substantial evidence that Toney Sidwell fell down those stairs at the Wedgewood Club because he was intoxicated?"

Claimant says it did not because: (1) Jay Magness, the pipe broker, testified that Sidwell did not appear to him to be intoxicated; (2) Jim Woolbright, a friend who had talked to Sidwell on the telephone at some unspecified time during the afternoon of the 16th, said that from the way decedent talked he did not sound like he had been drinking; (3) Jimmy the Greek [2] testified that although Sidwell had been drinking he "was in decent condition" around 1900 hours; and, (4) an Oklahoma University chemist and toxicologist, Kurt M. Dubowski, refused to give his opinion concerning Sidwell's state of intoxication at the time of the fall, on the ground he could not tell, he said, with "certainty" what Sidwell's blood alcohol concentration was at that particular time.

It seems to us that to state claimant's argument is to expose its weakness. To say there is evidence that Sidwell did not appear to be inebriated to two or three witnesses at various times during the fateful afternoon and that one expert declined to offer an opinion on decedent's condition in terms of alcoholic affectation because he could not do so with certainty, is not to say that there was no evidence of a substantial nature supporting a contrary inference. Nor is it fatal to the application of the statutory substantial evidence rule that there was some degree of conflict in the evidence. All that is required is significant evidence both in quality and quantity that is inconsistent with the presumption.

When viewed in its entirety the evidence supports the trial court's finding that there is substantial evidence that intoxication was not merely a cause but the only cause of Sidwell's fall. While there is no evidence as to when or how much or what kind of alcoholic beverage was consumed by the deceased, it was established rather conclusively that he had been drinking.

Sidwell, as we said, had talked to Woolbright earlier in the afternoon of the 16th regarding his need for some pipe. Woolbright arranged for Sidwell to meet Magness at the Wedgewood Club that evening around 1930 hours. In the meantime, Sidwell visited with his brother at the "Greek's Inn" operated by Jim Stravros. We do not know the exact time Sidwell was there, but we do know it was "early evening." Sidwell's brother did not testify and from the tenor of Stravros testimony we gather Sidwell was not at his place very long—"not over thirty minutes"—and did not have a drink while there. However, Stravros testified, "I thought he was drunk . . . he had difficulty standing, and just his mannerisms, speech . . . ."

Sidwell wanted his brother to take him to the Wedgewood Club for his meeting. Stravros heard the request and volunteered to take him since he was going that way anyway. And he did.

The Wedgewood Club manager, as we have already mentioned, testified that Sidwell was significantly intoxicated when he arrived at her club. The fact that he ordered a sandwich suggests that he had not eaten dinner and was hungry.

The course of events after Sidwell's arrival at the Wedgewood Club also suggests that the effect of whatever Sidwell had drunk earlier was nearing its peak as he talked to Magness in the crowded bar resulting in his abruptly excusing himself to head for the restroom. So near was his alcohol induced physiological crisis that he was unable to respond to the manager's request with more than an unintelligible

---

1. 85 O.S.1977 Supp. § 27.

2. Jim Stravros, owner of Greek's Inn.

mumble. These circumstances point strongly to an inference that the crisis hit him as he started down the stairs and he passed out.

And then too, there was the evidence concerning the alcoholic content of Sidwell's blood that evening. True, a problem exists because of the fact that the 0.19 percent lab report at 2243 hours does not indicate when the analyzed blood was drawn. But as the employer's expert[3] pointed out, if the blood was taken shortly before it was tested at 2243 hours, Sidwell's alcoholic content would have had over three hours after the fall to metabolize and lower the alcohol level. Using an average metabolism rate of .022 percent per hour and assuming Sidwell ingested no alcohol after 1930 hours, the toxicologist concluded that the alcohol content of Sidwell's blood at 1930 hours would have been about .267. With an alcohol blood level of this magnitude, a person would experience severe impairment of both mental and physical functions.

On the other hand if the blood sample was drawn earlier, say around 2030 hours, then the expert thought, assuming Sidwell consumed no alcohol after 1900 hours, that his blood alcohol level would have been at least as high as 0.19 percent at the time of his fall, and probably higher. This lower level still indicates a significant degree of intoxication in any individual and results in a moderately severe degree of impairment of both mental and physical functions.

We get the impression claimant's expert made an excessive effort to avoid conclusions he could have reasonably reached under the evidence. The testimony of the employer's expert, by comparison, appears consistent with both the circumstantial and medical evidence and is reasonable in terms of general knowledge and experience. Certainly it is not incompatible with the extensive scientific portions of the O.U. professor's testimony.

All these facts and circumstances, especially when coupled with the lack of any other contributive cause being shown, such as for example that someone bumped into Sidwell, or that he suffered a heart attack or stroke, convinces us the trial court correctly found that substantial evidence pointed to a finding that the fatal fall resulted from a state of intoxication and from that alone.

The order denying death benefits is affirmed.

BACON, P. J., and BOYDSTON, J., concur.

---

3. James C. Garriott, chief toxicologist for the Institute of Forensic Sciences and Assistant Professor in the Department of Pharmacology and Pathology at the University of Texas Southwestern Medical School at Dallas.